## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

**WILLARD A. MARKHAM,**

   **Plaintiff,**

**vs.**                                        **Case No.  1:15cv120-MP/CAS**

**CAROLYN W. COLVIN, Acting
Commissioner of the Social Security
Administration,**

   **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This is a Social Security case referred to the undersigned United
States Magistrate Judge for a report and recommendation pursuant to 28
U.S.C. § 636(b) and Local Rule 72.2(D).  It is now before the Court
pursuant to 42 U.S.C. § 405(g) for review of the final determination of the
Acting Commissioner (Commissioner) of the Social Security Administration
denying Plaintiff's application for a period of disability and  Disability
Insurance Benefits (DIB) pursuant to Title II of the Social Security Act.
After careful consideration of the record, it is recommended that the
decision of the Commissioner be affirmed.

## I. Procedural History

On August 22, 2011, Plaintiff, Willard A. Markham, filed an application for a period of disability and DIB, alleging disability beginning on June 21, 1996.  Tr. 20, 50, 87, 197, 230.  (Citations to the transcript/administrative record, ECF No. 8, shall be by the symbol "Tr." followed by a page number that appears in the lower right corner.)  Plaintiff's date last insured or the date by which his disability must have commenced in order to receive benefits under Title II (DIB) is December 31, 2001.  Tr. 20, 39, 87, 230.

Plaintiff's application was denied initially on September 22, 2011, and upon reconsideration on February 2, 2012.  Tr. 20, 92, 99-100, 102, 110. On March 12, 2012, Plaintiff filed a request for hearing.  Tr. 20, 117.  On July 25, 2013, Administrative Law Judge (ALJ) Michael A. Krasnow held a video hearing while presiding from Jacksonville, Florida.  Tr. 20, 36-86. Plaintiff appeared and testified in Gainesville, Florida.  Tr. 20, 41-75.  Ted D. Mitchell, M.R.C., Ed. S., an impartial vocational expert, testified during the hearing.  Tr. 20, 76-83, 159-62 (Resume).  Plaintiff was represented by Theodore M. Burt, an attorney.  Tr. 20, 115-16.

On September 27, 2013, the ALJ issued a decision denying Plaintiff's application for benefits.  Tr. 31.  On October 28, 2013, Plaintiff filed a request for review, Tr. 14-16, and a brief memorandum.  Tr. 4-5, 280.  On

March 4, 2014, counsel submitted a Memorandum in Support of Request for Review of Hearing Decision.  Tr. 4-5, 282-85.

On April 22, 2015, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. at 1-6; *see* 20 C.F.R. § 404.981.

On June 16, 2015, Plaintiff filed a Complaint with the United States District Court seeking review of the ALJ's decision.  ECF No. 1.  The parties filed memoranda of law, ECF Nos. 12 and 13, which have been considered.

## II.  Findings of the ALJ

The ALJ made several findings:

1. "The claimant last met the insured status requirements of the Social Security Act on December 31, 2001."  Tr. 22.

2. "The claimant did not engage in substantial gainful activity during the period from his alleged onset date of June 21, 1996[,] through his date last insured of December 31, 2001."  *Id.*

3. "Through the date last insured, the claimant had the following severe impairments: post-burn chronic pain syndrome, affective mood disorder, post-traumatic stress disorder, costochondritis, migraines, obesity, hyperlipidemia, and decreased visual acuity." *Id.*

4. "Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  *Id.*

The ALJ began his discussion of the evidence by noting that Plaintiff performed several activities prior to his date last insured including "taking care of personal needs, collecting coins, going to church, attending his children's soccer games, going shopping with his wife (used an electric cart), driving, applying for jobs, and exercising (Exhibits 11F/4-5 and 17, and hearing testimony)." Tr. 23. The ALJ summarized medical evidence at this step, which is generally repeated when he determined Plaintiff's RFC. Tr. 23-29. The ALJ concluded his findings at this step.

> Based on the evidence of record, including the activities of daily living and medical evidence discussed herein, the Administrative Law Judge finds that, prior to the claimant's date last insured, he had *mild* restrictions in activities of daily living; *moderate* difficulties in maintaining social functioning; *moderate* difficulties in maintaining concentration, persistence or pace; and *no* episodes of decompensation. Specifically, the claimant was able to take care of his personal needs, collect coins, attend church, attend his children's soccer games, go shopping with his wife, drive, apply for jobs, and exercise. Notwithstanding these activities, the claimant did experience problems with poor concentration and irritability that indicate *moderate* deficits in the areas of maintaining concentration, persistence, and pace, as well as social functioning.

Tr. 24 (emphasis added). The ALJ stated that the limitations noted above are not a RFC determination, "but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process." Tr. 24-25.

5. "[T]hrough the date last insured, the claimant had the residual functional capacity [RFC] to perform sedentary work as defined in 20 CFR 404.1567(a), except he needed a cane to ambulate; no climbing of ladders, ropes, and scaffolds; no crawling; no more than occasional climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling [sic]; no more than frequent use of near/far acuity; no more than frequent bilateral handling; had to

avoid concentrated exposure to hazards (unprotected heights, machinery, and moving parts); and was limited to simple, routine, repetitive tasks involving up to 3-step commands with no production rate for pace of work, instead work involving meeting goals, with no more than occasional interaction with the general public, co-workers, and supervisors." Tr. 25; *see* Tr. 76-80 (hypothetical questions posed to vocational expert).

At this step of the sequential evaluation process, the ALJ considered relevant evidence including Plaintiff's hearing testimony and the medical evidence of record from the VA and other medical sources. Tr. 25-29.

> At the hearing, the claimant testified to being injured in the military (1989) and medically retiring in June of 1996. He stated that he had not worked since that time, but that he had applied for jobs while living in Texas prior to moving to Florida. The claimant testified that he was involved in an explosion, which caused severe burns resulting in chronic pain; has loss of his peripheral vision; and suffered from migraines, costochondritis, post-traumatic stress disorder, major depression, and personality disorder. He stated that he received treatment through the Temple, Texas VA from 1996-2005 prior to moving to Florida. He stated that he was on low-level pain medications, muscle relaxer, anti-inflammatories, migraine medication, and antifungal treatment for his feet. The claimant testified that doctors told him he would not get any better and would always have problems with scar contractions. He stated that he also underwent physical therapy with various stretching exercise to prevent the contractions. The claimant testified that he was burned over 40% of his body (face, neck, mid arm to fingers, butt to just below the left ankle, and just below right knee to bottom of right foot). He stated that he started using a cane prior to 1996, which was prescribed and that he also had a roller walker, which was prescribed by the VA 12-13 years ago. He stated that he used the cane when walking on smooth services because had no

feeling in the left leg, which had a tendency to come out from under him if he got fatigued. The claimant testified that from 6/96 (AOD) until 12/31 (DLI), he could walk 10 steps before needing to rest, stand 10 minutes, sit 15-20 minutes, and lift 5-10 pounds. He stated that, when he tried to pick something up, it caused his chest and upper shoulders to become inflamed/have spasm. He stated that, if he moved wrong, he would have an attack (2-3 times a month). He stated that he would have to have needles stuck in his chest to relax muscles, which would cause him to act like a zombie for a few days until the inflammation and pain went away. The claimant testified that he also had a lot of psychological counseling for anger issues, anxiety, how to cope with his condition, frustration, and depression. He stated that he was on anti-depressants, but the side effects caused suicidal ideation. He stated that he had problems with crowds of three people, did not do well with strangers, and tried to avoid situations. He stated that he learned what his triggers were in PTSD group and learned how to avoid them. The claimant testified that, once he was out of rehab in 1993, he could shower (had walk in shower and shower stool), but could not button. He stated that he did not cook and could not do household chores. He stated that he went grocery shopping with his wife, but used an electric cart. He stated that reading caused headaches. The claimant testified that he collected coins, went to church, liked to fish (hurt to hold a rod), and went to his kids soccer games. He stated that he had a couple of cocker spaniels and he would let them out and give them food. The claimant testified that he had scar tissue from the skin graft, which shrunk his fingers (they wanted to curl up). He stated that he could not extend his arms or legs out, which could be very painful. The claimant testified that he had painful migraines 2-6 times a week, which sometimes lasted for days. He stated that nothing helped them; he lied around, suffered from nausea, and they made him dizzy. The

claimant testified that he had constant pain, which was triggered by activity and spent 4-5 hours a day in a recliner with his legs elevated.  He stated that he had no feeling in his left leg from below the ankle to the bottom of the feet due to nerve damage.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

In terms of the claimant's alleged impairments, the evidence of record documents symptoms and limitations; however, they did not prevent him from performing a restricted range of sedentary work prior to his date last insured.

Tr. 25-26.

The ALJ then considered medical records prior to and after Plaintiff's date last insured.

### MEDICAL RECORDS PRIOR TO THE CLAIMANT'S DLI

The evidence of record shows that the claimant suffered burns over 40% of his body in 1989 following an explosion while serving activity duty in the military. Following the accident, he spent several months in the Burn Unit and underwent multiple procedures for debridement and skin grafting of the burns.   In the months after his initial injury and treatment, he had a medical board done on him and it was recommended that he was not fit for duty.  However, the claimant underwent physical therapy and appealed the board's decision and was

placed back to duty.  Over the following 2-4 years, the
claimant began to develop multiple complaints, which he
felt was secondary to his burns and grafts.  He had
complaints of chest wall pain, bilateral lower extremity
pain, pain in his left hand and feet, headaches, and visual
problems.  He also began to develop multiple psychiatric
complaints and underwent evaluation and treatment by the
psychiatric service.  In May of 1995, Dr. Martin diagnosed
the claimant with chronic pain syndrome secondary to
burns with resultant scarring; post-traumatic stress
disorder; major depression, recurrent; personality disorder,
NOS; decreased visual acuity with loss of peripheral visual
fields; and migraine headaches without aura.  It was
recommended that the claimant be considered for
separation by the Physical Evaluation Board due to
inability to function in the military secondary to burns and
psychiatric diagnoses.  In January of 1996, the Physical
Evaluation Board found the claimant's medical and
physical impairments prevented reasonable performance
of duties required by grade and military specialty.  They
found the claimant unfit and recommended a combined
rating of 40%, and that the claimant's disposition be
permanent disability retirement [Tr. 286] (Exhibits
1F, 2F, and 9F).

In May of 1997, the claimant was seen in the VA Mental
Health Clinic for psychophysiological stress profile
analysis on referral for complaints of post-traumatic stress
symptoms and residual pain from severe burns and
numerous skin grafts involving the majority of skin surface
area.  It was noted that [t]he claimant was able to remain
focused on tasks.  However, he presented with evidence
of sustained stress reactivity.  His startle patterns were
frequent and occurred between tasks.  His recovery
pattern was generally slow and incomplete, which was
consistent with stress.  During an individual psychotherapy
session in July of 1997, the claimant reported feeling very
hopeless and depressed about his therapy and whether or

not there had been any positive changes.  He reported continuing severe nightmares about his injury and voiced concern that his experience was so different from others in the group.  Mental health notes from psychology group sessions in August of 1997 show that the claimant's post-traumatic stress disorder symptoms were ongoing and severe.  Dr. Wills stated that the claimant should continue to attend Phase I Group.  In September of 1997, the claimant was seen at the VA Mental Health Clinic for individual psychotherapy session.  At that time, he continued to have sleep problems, anxiety,  and anger, but reported some progress in management of the symptoms secondary to participation in psychotherapy milieu.  He stated that he was ready to be transferred from Phase I of treatment to Phase II, which would be done in mid-October (Exhibit 11F).

In October of 2000, the claimant was seen at the VA Primary Care Clinic for complaints of shortness of breath and not feeling well after exercise and walking.  Past medical history was positive for costochondritis, obesity, and 50% burns over his body (2nd & 3rd degree) since 1989.  Examination revealed a well-developed, obese gentleman who was is no acute distress.  He was 67.5 inches tall and weighed 280 pounds. Musculoskeletal exam revealed burns, mostly localized on both lower extremities as well as upper extremities.  There was also a scar from the skin, which was taken off from the back.  He had had multiple surgeries on his face.  Psychiatric exam did not reveal any cognitive or communication impairment. Dr. Mehta stated that the claimant had significant problems as indicated above; however, his major problem at that time was exogenous obesity and start of his exercise, which he was not used to.  In December of 2000, he was seen for follow-up of depression.  He had no new complaints.  He had symptoms of depression and was awaiting MHC consult.  Examination revealed the claimant was 69 inches tall and weighed 284 pounds.  Lungs were clear, heart normal, abdomen benign, and no edema.  Dr. Mehta's

diagnosis was depression, obesity, and history of burns. [Tr. 640]  During five-month follow-up in April of 2001, the claimant had complaints of extremity pain.  Examination was unchanged. Dr. Mehta's diagnosis was post-traumatic stress disorder, obesity, and history of 40% burns [Tr. 637] (Exhibit 11F).

In June of 2001, the claimant was seen at the VA Medical Health Center for an initial assessment.  It was noted that the claimant had a 100% service connected disability.  He had complaints of depression and post-traumatic stress disorder.  He reported symptoms of loss of interest in things, feeling overwhelmed, unhappiness, anger, crying spells, low energy, isolation, weight gain, headaches, blurry vision, concentration problems, forgetfulness, sleep problems, and flashbacks.  He reported no use of alcohol, illegal drugs, or cigarettes.  He stated that following his military accident, he was treated with Morphine for pain from his burns.  He stated that he became addicted to the drug and it took him three years for the use of Morphine to be discontinued.  The claimant stated that, since getting out of the military, he had applied at several businesses, but had not been able to obtain/maintain a job.  During the evaluation, the claimant was tearful.  He appeared alert and oriented times three with no indication of thought disorder. He was not psychotic.  His mood appeared dysphoric with congruent affect.  Carolyn Greens, LMSW, diagnosed the claimant with depression and a GAF of 55.[1] She referred the claimant to

---

[1]  On April 4, 2008, Plaintiff received a GAF score of 60 while at the VA Medical Center.  Tr. 473.  The American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000) includes the GAF Scale that is primarily used by mental health practitioners.  The GAF Scale is used to report "the clinician's judgment of the individual's overall level of functioning" (with regard to only psychological, social, and occupational functioning) and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure."  *See* DSM-IV-TR 32-34.  The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale.  *Id.  See* Nichols v. Astrue, Case No. 3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug.

Dr. Chintapalli, a psychiatrist, for further evaluation and medication treatment. The claimant saw Dr. Chintapalli in June of 2001 and was diagnosed with adjustment disorder with depression; and post-traumatic stress disorder, by history. He was started on Nefazodone [Tr. 632-33, 636] (Exhibit 11F).

During follow-up at the VA Mental Health Clinic in August of 2001, it was noted that the claimant was started on Nefazodone in June. The claimant reported no change in symptoms of depressed mood, poor concentration, anger, irritability, or insomnia. However, he had only been taking a 1/2 tablet BID because he had misread the instructions on the bottle. The claimant was overweight, depressed, easily distractible, and poverty of speech. He had some suicidal ideation, but denied plan or intent. Dr. Chintapalli's diagnosis was adjustment disorder with depressed mood (Exhibit 11F).

## MEDICAL RECORDS AFTER THE CLAIMANT'S DLI

Medical records from the VA Clinic covering the period April of 2008 through April of 2013 show that the claimant was diagnosed with neck/back pain, migraines, post-traumatic stress disorder, burns to extremities s/p skin grafts in 1989, obesity, otalgia/tinnitus, conductive hearing loss, visual changes, dysuria, cervical strain, diverticulosis, kidney stones, morbid obesity, seborrheic dermatitis, open angle

---

7, 2012) (discussing the GAF scale). A GAF scale rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV-TR at 34. The "Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (unpublished) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)). In the Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) (2013), "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice. In order to provide a global measure of disability, the WHO DSM-5 (see the chapter "Assessment Measures")." DSM-5 at 16.

glaucoma, history of dry eyes, and upper respiratory
infection (Exhibits 4F, 6F, 7F, 8F, and 1OF).

*In sum, the above residual functional capacity assessment
is supported by the following.* First, the claimant described
daily activities, which were not entirely limited prior to his
date last insured (DLI) and that were consistent with the
residual functional capacity established in the record.  The
Administrative Law Judge notes that at one point  or
another in the record, the claimant reported performing the
following activities prior to his date last insured: taking care
of  personal  needs,  collecting  coins,  going  to  church,
attending  his  children's  soccer  games,  going  shopping
with his wife (used an electric cart), driving, applying for
jobs, and exercising (Exhibits 11F/4-5 and 17, and hearing
testimony).

Second, although the claimant received treatment for the
allegedly disabling impairments prior to his date last
insured, that treatment was essentially routine and/or
conservative in nature.  Furthermore, the record reflects
significant gaps in the claimant's history of treatment.  The
evidence of record shows that the claimant suffered burns
over 40% of his body in 1989 following an explosion while
serving activity duty in the military.   Following the accident,
he spent several months in the Burn Unit and underwent
multiple procedures for debridement and skin grafting of
the burns.  He was placed back on duty following an
appeal with the medical board.  However, around 1991 or
1992, he began to develop multiple complaints, which he
felt were secondary to his burns and grafts.  In May of
1995, Dr. Martin diagnosed the claimant with chronic pain
syndrome secondary to burns with resultant scaring; post-
traumatic stress disorder; major depression, recurrent;
personality disorder, NOS; decreased visual acuity with
loss of peripheral visual fields; and migraine headaches
without aura.  In January of 1996, the claimant was found

unfit for duty with a combined rating of 40%; he went out on a permanent disability retirement [Tr. 286] (Exhibits 1 F, 2F, and 9F).  Medical records from the VA covering the period May of 1997 through September of 1997 show that the claimant was diagnosed with post-traumatic stress disorder and attended both group and individual therapy. There are no medical records in the file after 1997 until October of 2000 at which time the claimant was seen at the VA Primary Care Clinic for complaints of shortness of breath and not feeling well after exercise and walking. Records from October of 2000 through August of 2001 show that the claimant was diagnosed with costochondritis, obesity, burns over 50% of his body, adjustment disorder with depression, and post-traumatic stress disorder.  In June of 2001, he was assigned a GAF of 55, which represents moderate symptoms or difficulty in one area of functioning (Exhibit 11F) [*see supra* at n.1].

*Third, the Administrative Law Judge notes that, although the VA Administration found the claimant unfit for duty, he is not bound by the decision of another governmental or non-governmental agency.  Furthermore, the VA decision does not address the factors which are relevant to the issue of disability under the Social Security Act (20 CFR § 404.1504).  Consequently, while the clinical findings reported by the VA medical staff were given appropriate weight as medical sources, the final opinion as to degree of disability is not entitled to controlling weight.*

Tr. 25-29 (emphasis added).

6. "Through the date last insured, the claimant was unable to perform any past relevant work" that he performed in the Army "as a tanker, mortar tracker, paratrooper, aviator, personal administrator, and intelligence aviator analyst."  Tr. 29.

7. "Through the date last insured, considering the claimant's age, education, work experience, and [RFC], there were jobs that

existed in significant numbers in the national economy that the claimant could have performed," including representative occupations such as a tube operator; a cutter/paster, press clippings; and a stuffer, all sedentary, unskilled work, all with a Specific Vocational Preparation (SVP) of 2.[2]  Tr. 30; *see* Tr. 79-80 (vocational expert testimony).  Plaintiff was 41 years old, which is defined as a younger individual age 18-44, on the date last insured.  Tr. 29.

8.  "The claimant was not under a disability, as defined in the Social Security Act, any time from June 21, 1996, the alleged onset date, through December 31, 2001, the date last insured."  Tr. 31.

## III.  Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  42 U.S.C. § 405(g); <u>Chester v. Bowen</u>, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less

---

[2]  "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).  "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  20 C.F.R. § 404.1568(a).  Further, unskilled work is work involving understanding, remembering, and carrying out simple instructions; making simple work-related decision; dealing with changes in a routine work setting; and responding appropriately to supervision, co-workers, and usual work situations.  SSR 85-15, 1985 SSR LEXIS 20, at *10-11 (1985).  An SVP of 2 means "[a]nything beyond short demonstration up to and including 1 month."  Dictionary of Occupational Titles (DOT) (4th ed., rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP.  "[SVP] is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  *Id.*  Unskilled work corresponds to an SVP of one and two.  Social Security Ruling (SSR) 00-4p, 2000 SSR LEXIS 8, at *8 (Dec. 4, 2000).

than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).  The court may not reweigh the evidence or substitute its own judgment for that of the ALJ even if it finds that the evidence preponderates against the ALJ's decision. Moore, 405 F.3d at 1211.[3]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age,

---

[3] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212 (2002).  In addition, an individual is entitled to DIB if he is under a disability prior to the expiration of his insured status.  *See* 42 U.S.C. § 423(a)(1)(A); Moore v. Barnhart, 405 F.3d at 1211; Torres v. Sec'y of Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)(4)(i)-(v).

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4. Does the individual have the RFC to perform work despite limitations and are there any impairments which prevent past relevant work?[4]

5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work.  If

---

[4] An RFC is the most a claimant can still do despite limitations.  20 C.F.R. § 404.1545(a)(1).  It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records.  *Id.*  The responsibility for determining claimant's RFC lies with the ALJ.  20 C.F.R. § 404.1546(c); *see* SSR 96-5p, 1996 SSR LEXIS 2, at *12 (July 2, 1996) ("The term "*residual functional capacity assessment*" describes an adjudicator's finding about the ability of an individual to perform work-related activities.  The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence.").

the claimant can still do past relevant work, there will be a finding that the

claimant is not disabled.  If the claimant carries this burden, however, the

burden shifts to the Commissioner at step five to establish that despite the

claimant's impairments, the claimant is able to perform other work in the

national economy in light of the claimant's RFC, age, education, and work

experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224,

1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786

F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v), (e) & (g).

If the Commissioner carries this burden, the claimant must prove that he or

she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

## IV.  Legal Analysis

### A. Introduction

This is an unfortunate case involving a veteran who was critically

injured while performing his duties in the U.S. Army.  He received 100%

disability rating and was discharged from service.  The question is whether

he is entitled to disability benefits under the Social Security Act.

Plaintiff argues that the ALJ erred by not giving great weight to the

decision of the VA that Plaintiff is entitled to an individual unemployability

rating or 100% disability rating by the VA.  ECF No. 12 at 11-16.  Plaintiff

requests that this matter be remanded to the Commissioner "with instructions to give great weight to the VA's decision that [Plaintiff] Markham is 100% disabled because he is unable to maintain substantial employment." *Id.* at 16.

Plaintiff does not provide the Court with a summary of Plaintiff's medical history.  ECF No. 12.  Rather, Plaintiff states that "he is a service-connected disabled veteran rated at 100% by the [VA]."  *Id.* at 7 (citing to Tr. 496).  Plaintiff provides the percentages comprising his 100% disability.  *Id.*  Plaintiff refers to his service records which include his "burn scars" and percentage of body surface area affected.  *Id.* at 7-8 (citing to Tr. 289).  Further, "as a direct and proximate result of his burning injuries," Plaintiff asserts that he was diagnosed with chronic pain syndrome, secondary to burns with resultant scarring; post-traumatic stress disorder, labeled as Axis I; major depression, recurrent, labeled as Axis I; personality disorder, not otherwise specified, labeled as Axis I decreased visual acuity with loss of peripheral visual fields; and migraine headaches without aura.  *Id.* at 8 (citing to Tr. 301).  Plaintiff provided additional notes from Army doctors.  *Id.*  Plaintiff also notes that although he was discharged from service in 1996, he did not apply for Social Security disability benefits until the summer of 2011.  ECF No. 12 at 8.

Plaintiff spends most of his memorandum discussing the manner in which the VA determined that he was 100% disabled and received a TDIU [Total Disability based on Individual Unemployability] rating.  ECF No. 12 at 12-16.  After discussing the VA's disability review process, Plaintiff suggests that the "VA regulations regarding TDIU are tougher than the Social Security disability regulations because they prohibit the VA from considering some factors that the Social Security Administration considers" such that the VA does not consider the veteran's age or the veteran's non-service-connected disabilities.  *Id.* at 14-15 (citations omitted).

Aside from referring to several basic findings by the ALJ, Plaintiff does not discuss the ALJ's consideration of the evidence including the VA's determination.  ECF No. 12.

### B. The ALJ did not commit reversible error in not giving great weight to and adopting the disability determination made by the VA and in further finding that Plaintiff was not permanently and totally disabled as of June 21, 1996, his alleged onset date, through his date last insured, December 31, 2001.

Plaintiff argues that the ALJ erred in not giving appropriate weight (great weight) to the determination made by the VA that he was permanently and totally disabled as of June 21, 1996.  ECF No. 12.  The Commissioner responds that no error was committed.  ECF No. 13.

Plaintiff, as the claimant, bears the burden of proving that he is disabled, and consequently, is responsible for producing evidence in support of his claim.  *See* 20 C.F.R. § 404.1512(a); <u>Moore v. Barnhart</u>, 405 F.3d at 1211. "Evidence is anything you or anyone else submits to us or that we obtain that relates to your claim."  This includes, but is not limited to: . . . (5) Decisions by any governmental or nongovernmental agency about whether you are disabled or blind."  20 C.F.R. § 404.1512(b)(5).

In Social Security Ruling (SSR) 06-03p, 2006 SSR LEXIS 5 (2006), the Commissioner provides a policy interpretation ruling regarding, and relevant here, consideration that may be given to decisions by other governmental and nongovernmental agencies.  In part, the Commissioner refers to 20 C.F.R. § 404.1504 as follows:

> [a] decision by any governmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind.  We must make a disability or blindness determination based on social security law.  Therefore, a determination made by another agency [e.g., Workers' Compensation, the Department of Veterans Affairs, or an insurance company] that you are disabled or blind is not binding on us.

SSR 06-03p, 2006 SSR LEXIS 5, at *16.  The Commissioner makes clear that "only a State agency or the Commissioner can make a determination based on Social Security law that" a claimant is disabled and the Commissioner is not bound by any such decision.  *Id.* at *17.  The

Commissioner confirms, however, that all the evidence must be evaluated, including decisions by other governmental and nongovernmental agencies, citing to 20 C.F.R. § 404.1512(b)(5).  SSR 06-03p, 2006 SSR LEXIS 5, at *17.  "Therefore, evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered." *Id.*

> These decisions, and the evidence used to make these decisions, may provide insight into the individual's mental and physical impairment(s) and show the degree of disability determined by these agencies based on their rules.  We will evaluate the opinion evidence from medical sources, as well as "non-medical sources" who had contact with the individual in their professional capacity, used by other agencies, that are in our case record, in accordance with 20 CFR 404.1527, 416.927, Social Security Rulings 96-2p and 96-5p, and the applicable factors listed above in the section "Factors for Weighing Opinion Evidence."

SSR 06-03p, 2006 SSR LEXIS 5, at *17-18.

The Eleventh Circuit has held that "[t]he findings of disability by another agency, although not binding on the Secretary, [now the Commissioner], are entitled to great weight."  Falcon v. Heckler, 732 F.2d 827, 831 (11th Cir. 1984), *reh'g granted*, 1984 U.S. App. LEXIS 20236, at *1 (11th Cir. 1984) (quoting Bloodsworth v. Heckler, 703 F.2d at 1241)). Relevant here, a disability rating by the VA is not binding on the Commissioner, but is entitled to great weight.  Brady v. Heckler, 724 F.2d 914, 921 (11th Cir. 1984); Rodriguez v. Schweiker, 640 F.2d 682, 686 (5th

Cir. 1981) (holding that "a V[eterans] A[dministration] rating is certainly not binding on the [Commissioner], but it is evidence that should be considered and is entitled to great weight  . . . and should have been more closely scrutinized by the ALJ."  (citations omitted))[5]; *see* Adams v. Comm'r of Soc. Sec., 542 F. App'x 854, 856-57 (11th Cir. 2013) (unpublished).[6]  In Adams, the Court noted: "Adams contends that the ALJ must state how much weight he assigned to the VA determination, but this contention is meritless.  Adams does not cite any decision holding that the ALJ must state the precise amount of weight he gives the VA's disability determination."  *Id.* at 856-57.  The Court further noted: "[A]lthough the ALJ did not expressly state that he gave 'great weight' to the VA's rating, the record shows that he expressly considered and closely scrutinized it."  *Id.* at 857.  Here, Plaintiff argues that the ALJ did not give appropriate weight to the VA disability decision.

The ALJ discussed the objective medical evidence, Plaintiff's treatment history and testimony, and the medical opinions, including

---

[5]  Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981, are binding precedent in the Eleventh Circuit.  Bonner v. Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

[6]  Although unpublished opinions are not considered binding, they may be considered as persuasive authority.  *See* 11th Cir. R. 36.2; *see also* United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000).

treatment Plaintiff received by medical sources at the VA relating to Plaintiff's severe impairments.  Tr. 25-29.  The ALJ further examined the evidence of record and explained why Plaintiff could perform within the limits of the restrictive RFC assessment and thus was not disabled as suggested by the VA disability determination.  Tr. 28-29.  As a result, the ALJ considered and weighed the medical findings and opinions contained in the VA records that substantially formed the basis of the VA disability determination.  *Id.*

The ALJ determined that "[t]hrough the date last insured, [Plaintiff] was unable to perform any past relevant work."  Tr. 29; *see* Tr. 76-79.  The ALJ noted that the Plaintiff's "ability to perform all or substantially all of the requirements of" a full range of sedentary work "was impeded by additional limitations."  Tr. 30.  In order "to determine the extent to which these limitations erode the unskilled sedentary occupational base, through the date last insured, the [ALJ] asked the vocational expert whether jobs existed in the national economy for an individual with the [Plaintiff's] age, education, work experience, and [RFC]."  *Id.*

The ALJ asked the vocational expert to assume Plaintiff was unable to perform past relevant work and to assume further that Plaintiff was limited to sedentary work with exceptions.  Tr. 76-79.  The vocational

expert opined that Plaintiff could perform three representative jobs such

tube operator; cutter and paster, press clippings; and stuffer, all with an

exertional level of sedentary, unskilled with an SVP of two.  Tr. 79; *see*

*supra* at n.1.  The vocational expert clarified that these jobs could be done

if a person required a cane for ambulation and also if a person had an

additional limitation to frequent handling bilaterally.  Tr. 80.  The vocational

expert stated that his testimony was consistent with the DOT and that these

jobs existed in sufficient numbers nationally during the time period from

February 1996 through December 2001, Plaintiff's date last insured.

Tr. 80, 82; *see* Tr. 30.

The ALJ considered the clinical findings of the VA medical staff and

other medical evidence in light of Plaintiff's complaints and severe

impairments and also considered the VA's disability determination in light of

this evidence.  The ALJ explained that his RFC assessment was supported

by the evidence, including Plaintiff's described daily activities, such as the

ability to drive, collect coins, play racquetball, apply for jobs, walk for

exercise, shopped for groceries, take care of personal needs, and attend

church and his children's soccer games, *see, e.g.*, Tr. 28-29, 44-45, 49, 68-

71, 632-33, 645-46[7]; that Plaintiff "received treatment for the allegedly

---

[7]  *See* Macia v. Bowen, 829 F.2d 1009, 10012 (11th Cir. 1987).

disabling impairments prior to his date last insured" and "that treatment was essentially routine and/or conservative in nature" between June 1996 and December 2001, *see, e.g.*, Tr. 632-33, 635-36, 645-48[8]; and that there were "significant gaps in the [Plaintiff's] history of treatment" after 1997 until October 2000.  Tr. 28-29.

The ALJ briefly stated his reasons for not giving the VA's disability determination, as to Plaintiff's degree of disability, "controlling weight" and stated:

> Third, the Administrative Law Judge notes that, although the VA Administration found the claimant unfit for duty, he is not bound by the decision of another governmental or non-governmental agency. Furthermore, the VA decision does not address the factors which are relevant to the issue of disability under the Social Security Act (20 CFR § 404.1504).  *Consequently, while the clinical findings reported by the VA medical staff were given appropriate weight as medical sources, the final opinion as to degree of disability is not entitled to controlling weight.*

Tr. 29 (emphasis added).

Although the ALJ's explanation was cryptic, this is not a case where the ALJ merely referenced the VA's disability determination without discussing the claimant's VA treatment record and offered no explanations related to any VA treatment records or explain the reason for discounting

---

[8]  *See* Chereza v. Comm'r of Soc. Sec., 379 F. App'x 934, 940-41 (11th Cir. 2010) (unpublished); Osborn v. Barnhart, 194 F. App'x 654, 665 (11th Cir. 2006).

the VA's disability determination in view of the record.  *See, e.g.*, Baldwin v. Colvin, Case No. 3:14cv157/MCR/MD, U.S. Dist. LEXIS 124449, at *3-5 (N.D. Fla. Sept. 17, 2015).  Here, the ALJ considered Plaintiff's treatment record at the VA and elsewhere and Plaintiff does not suggest the ALJ overlooked any material evidence, including Plaintiff's testimony.  ECF No. 12.  Although the ALJ declined to give controlling weight to the VA disability determination and did not expressly state he gave "great weight" to it, there is no indication that the ALJ did not give the VA's determination great weight or appropriate consideration.  *See* Boyette v. Comm'r of Soc. Sec., 605 F. App'x 777, 779 (11th Cir. 2015) (unpublished).

Finally, as noted by the Commissioner, ECF No. 13 at 5, the VA considers a veteran "permanently and totally disabled" if the Commissioner of Social Security has found the veteran disabled.  *See* 38 U.S.C. § 1502(a)(2).  Here, the Commissioner has not found Plaintiff disabled, indicating the VA utilized another standard for assigning Plaintiff a 100% disability rating.  Moreover, the VA rating did not discuss in detail Plaintiff's possible work-related limitations and it does not appear that the VA evaluated what jobs Plaintiff could or could not do upon discharge from the

U.S. Army.[9]  *See, e.g.*, Tr. 286-377, 668-70.  The VA rating does not show that Plaintiff's condition satisfied the definition of disability under the Social Security Act.  *Id.*

Although the ALJ did not expressly assign the VA rating great weight, he noted that he assigned the appropriate weight to the VA medical staff's clinical findings and he found the VA rating itself was not entitled to controlling weight.  Tr. 29; Boyette v. Comm'r of Soc. Sec., 605 F. App'x at 779 (affirming because although ALJ did not expressly assign VA decision great weight, ALJ scrutinized VA decision and explained why it was not entitled controlling weight).  Substantial evidence supports the ALJ's consideration and weight given to the VA's disability determination.  Adams v. Comm'r of Soc. Sec., 542 F. App'x at 856-57.

---

[9]  A Medical Evaluation Board Addendum, completed by a military physician on or about December 18, 1995, provided a military, family/social, and present illness history, and provided a subsequent course evaluation and treatment for psychological issues.  Toward the end of the addendum, it is stated:

> CPT Markham demonstrates an ability to engage in business and work, although his psychiatric symptoms do make it more painful and difficult to engage with others socially in his work.  His main frustration and depression while attempting to do jobs while awaiting his MEB [Medical Evaluation Board] has been the length of time involved in the MEB process and the seeming elusiveness of an end to the process. Moreover, his depression and post traumatic stress disorder symptoms do completely prevent him from being able to continue in his present MOS as an aviator.

Tr. 293.

## V.  Recommendation

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED** pursuant to sentence four of 42 U.S.C. § 405(g) and judgment entered for the Commissioner.

**IN CHAMBERS** at Tallahassee, Florida, on January 4, 2016.


**s/  Charles A. Stampelos**
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**